UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAY SCOTT CLARK,

Petitioner,

Case No. 4:21-cv-11938
Hon. F. Kay Behm

v.

NOAH NAGY,

Respondent.
______________________________________/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS AND (2) DENYING CERTIFICATE OF APPEALABILITY**

Jay Scott Clark is a Michigan prisoner serving a life sentence for his Hillsdale County jury trial conviction of first-degree premeditated murder and felony-firearm. Clark filed this petition for writ of habeas corpus under 28 U.S.C. § 2254, asserting that his Fifth Amendment rights were violated when police obtained a confession after he terminated an earlier interview by requesting counsel. Clark argues that his unsolicited statement to police after the first interview that he wanted to sign his co-defendant's statement blaming him for the crime did not constitute the reinitiation of contact such that a second

interview was permitted. For the reasons that follow, the Court finds that Clark fails to demonstrate entitlement to habeas relief.

## I. Facts and Procedural History

On April 2, 2017, a group of boys found the decomposing body of Jeremy Barron in a wooded area in rural Hillsdale County. (Trial Tr. I, ECF No. 10-4, at 127-29, 142, 165.) Barron had been shot five times. (*Id*. at 168, 173-75.)

On April 4th and 9th, Detectives from the Hillsdale County Sheriff's Department interviewed Ashley Hoath, who they suspected was involved in the murder. (*Id.* at 219.) Based on Hoath's statements, the detectives identified Clark as another suspect. (*Id.* at 219-20.) An intoxicated Clark was arrested later in the day on April 9th, and he was placed overnight in a detox cell at the Hillsdale County Jail. (*Id.* at 220-21, 240-41.) The next day, he confessed to detectives that he shot Barron in his truck with a .45 caliber handgun, dumped the body in the woods, attempted to burn the seat in the truck where Barron was shot, melted the gun, and traded his truck for the vehicle he was arrested in. *See People v. Clark*, 948 N.W. 2d 604, 614 (Mich. Ct. App. 2019).

Clark moved to suppress his confession prior to trial. At the suppression hearing, Sergeant Kevin Bradley testified that Clark was arrested at 5:30 p.m. on April 9th and was brought to the interview room at 11:20 a.m. the next morning. (Hearing Tr., ECF No. 10-3, at 7-10.) Clark appeared cogent and alert, and he didn't request any assistance. (*Id.* at 11.)

Bradley testified that "after introducing ourselves to him, I told him basically that we had already spoken to Ashley; that she had made him the trigger man, but that since he was under arrest and not free to leave that we were gonna read him his rights and I asked him if he had ever been read his rights before which he acknowledged he had been read his rights before." (*Id.* at 12.)

After he read Clark his *Miranda*[1] rights Bradley testified that "Deputy Ludeker then told him again or reiterated to him that we'd spoken to Ashley; that she had said basically that Mr. Clark - Clark was responsible for everything. She had nothing to do with it. That she was basically selling him down the river. At that time, he stated he wanted an attorney before he said anything." (*Id.* at 12-13.) The interview was

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

stopped, and Deputy Jeffrey Miller from the corrections division walked Clark back to his cell. A video recording of the entire four-to-five-minute exchange was played for the court. (*Id.* at 13, 20.)

A few minutes after the first interview, Bradley was informed that Clark wanted to talk again. (*Id.* at 20-21.) The second interview began about five minutes after the first one. (*Id.* at 33.) Bradley testified that "After he entered, he sat down again. Corrections Officer Miller exited, secured the door. At that time, Deputy Ludeker reminded him that he had initially invoked his right to an attorney saying he wanted an attorney before he spoke to us. He was then asked if he had changed his mind and wanted to talk to us which he acknowledged that he did - had changed his mind and that he did want to speak with us." (*Id.* at 22.)

Clark told Bradley and Ludeker that "Whatever Ashley said happened, is what happened." (*Id.* at 22.) According to Bradley, Ludeker again reminded Clark "that he had invoked his right approximately five minutes prior; that he was reminded that he invoked that right and he was asked if he changed his mind which he acknowledged that he had and that he did want to speak to us now." (*Id.* at 22-23.) Clark was not

read his *Miranda* rights again. Bradley testified that Ludeker simply reminded Clark that they had just been read to him. (*Id.* at 23.)

Bradley testified that "After he had said that whatever Ashley said had happened was what happened, both Deputy Ludeker and I explained to him that that's not how it works. You need to tell us your version so that we know that the truth is being told by both parties." (*Id.* at 23.)

Another officer then cracked the interview room door open and told Bradley that the video system had not been turned on again, and this initial 30-to-45 second exchange was not recorded. (*Id.* at 23-24.) The video system was turned on, and during the next twenty minutes Clark confessed to shooting Barron. (*Id.* at 25-26.) It appeared to Bradley that Clark wanted to protect Hoath. (*Id.* at 36.)

Bradley testified that Clark made no indication that he was unwilling to talk, he did not appear sleepy or incoherent, and he did not express any lack of understanding of his rights. (*Id.* at 26.) Bradley testified that "It was clear … he did [understand his rights]. He invoked his rights to begin with. And actually asked a question about he could stop whenever he wanted to stop. So to me, he clearly understood his

rights when he read them - was read them." (*Id.* at 26-27.) The video of the second interview was played for the court. (*Id.* at 28-29.)

Jeffrey Miller testified that he was a corrections deputy at the jail. (*Id.* at 37.) Miller was buzzed to retrieve Clark from the interview room after the first interview. (*Id.* at 40.) Miller testified that "When I retrieved Mr. Clark from the interview room, we were, I don't know, it's maybe five-ten feet. I don't know how many steps that is or anything like that, walkin' right by the dispatch door to where our office is located. Mr. Clark says, 'Hey, can you tell those guys, however Ashley said it happened, I'll sign whatever's needed.' I said to Mr. Clark, I believe, okay or something like that, secured him back into the de-tox cell." (*Id.* at 41, lines 17-19.)[2] Miller didn't recall asking Clark any questions or saying anything to Clark about Ashley as he walked him back to his cell. (*Id.* at 42, 44.)

Miller found Ludeker and told him what Clark said, and then Clark was walked back to the interview room. (*Id.* at 43.)

[2] Miller also testified that Clark's statement was "'Hey, could you tell those guys however Ashley said it happened, I'm willing to sign whatever,'" omitting the "is needed." (*Id.* at 41, lines 1-3.)

Deputy Wesley Ludeker testified that he was told by Miller that Clark wanted to speak to them again. (*Id.* at 46.) No contact was made with Clark between the two interviews. (*Id.* at 47.)

Ludeker testified that "When he entered the second time, I reminded him that he had been read his *Miranda* warnings and that he understood them. He stated, 'Yes.' I asked him if he was going to waive his rights at that time and speak to us and he stated that he would speak to us about the situation." (*Id.* at 47-48.) Ludeker clarified that Clark "stated that he remembered being read them; he understood them and was waiving those rights at that time and was going to give a statement." (*Id.* at 48.) Clark gave no indication from his behavior or actions that he was not there voluntarily. (*Id.* at 48.)

Ludeker testified that "His initial statement to Sergeant Bradley and I was: 'Whatever Ashley said happened is how it happened is how it happened.' We obviously asked if he'd go into further detail as to his involvement and what had occurred." (*Id.* at 49.) Ludeker understood that Clark had said to Miller something to the effect of "'Hey, get a hold of those guys again,' meaning myself and Sergeant Bradley 'whatever Ashley said happened happened and I'll sign it.'" (*Id.* at 49.)

Clark also testified at the suppression hearing. Clark claimed that he was never reminded of his rights before the second interview, but he acknowledged that he was reminded that he had invoked his right to counsel during the first interview. (*Id.* at 56-57.) He recalled Bradley asking Ludeker whether Miller had to sign some piece of paper, and that Ludeker said "no." (*Id.* at 57.)

Contrary to Miller's account, Clark testified that while Miller was taking him back to his cell after the first interview, "Miller had said somethin' to me to get my mind goin' about Ashley. I don't recall exactly what it was, but I wanted to talk to the sheriffs after that 'cause I was still thinkin' that she was gonna be in jail." (*Id.* at 60.) According to Clark, Miller "said something about Ashley and her bein' in jail ... gettin' charged or somethin'." (*Id.* at 61-62.)[3] The court asked Clark, "Okay, so who brought up the idea of saying 'Hey, I want to talk to those guys again?" and Clark responded, "It was me." (*Id.* at 62.)

Defense counsel presented no argument that Clark's actions did not constitute a reinitiation of contact with the police. Defense counsel's

---

[3] The trial court at least implicitly rejected this account, finding that no attempt was made to discuss the case with Clark before he made the reinitiating statement. (*Id.* at 95, lines, 7-10.)

sole argument was that police were required to give Clark new *Miranda* warnings before the second interview, and that merely reminding him of the previous warnings was insufficient. (*Id.* at 69-73.)

The trial court made a lengthy ruling from the bench. Among its findings, the court stated that "Here we have a five-minute gap in this particular case. He was advised, reminded of his rights which were read to him just moments before and then after initiating the conversation, he made the incriminating statements." (*Id.* at 93.) The court rejected defense counsel's argument, and it found that the police were not required to read Clark his *Miranda* rights again before the second interview given the five-minute gap between the two. (*Id.* at 95-96.)

Clark was subsequently convicted after a jury trial during which his confession to police and other evidence of his guilt was admitted. *See Clark*, 948 N.W. 2d at 614-619.

Clark filed a claim of appeal in the Michigan Court of Appeals. His appellate brief raised five claims, including one challenging his confession on multiple grounds:

> III. Defendant's waiver of his *Miranda* rights was not valid where he initially invoked his right to counsel; the entire interrogation was not recorded contrary to MCL 763.8 and introduction of only a portion violated the rule of

> completeness, and counsel was ineffective in failing to object on these grounds; the recording contains highly inflammatory comments not relevant to the instant case; the trial court erred in denying the motion to suppress the statement.

(ECF No. 10-9 PageID.1138.)

In his appellate brief, Clark conceded that he reinitiated contact with police after the first interview, but as he did in the trial court, he asserted that police were required to administer *Miranda* warnings again before the second interview:

> The question here does not rest on whether Mr. Clark gave a valid waiver, but rather was he re-informed of his *Miranda* rights pursuant to [*People v. Kowlaski*, 230 Mich. App. 464 (1998)] prior to obtaining a waiver. During Interview one, Mr. Clark was properly provided with his *Miranda* warnings and invoked his right to counsel. Once Defendant informed the officers that he wished to speak with an attorney, Interview one ended. After invoking his rights during Interview one, Mr. Clark reinitiated contact with police and the interrogation eventually resumed. Since this occurred, a heavy burden is on the State to positively prove that the officers properly provided Mr. Clark with new warnings and obtained a valid waiver.

(*Id.* PageID.1144-45.)

The Michigan Court of Appeals affirmed in a published opinion. *Clark*, 948 N.W. 3d 604. With respect to the suppression claim, the court noted that some of the grounds presented on appeal were not

preserved in the trial court and were subject to "plain error" review. *Id.* at 414. With respect to the preserved constitutional claim, the court noted that, "On appeal in this case, defendant does not argue that the statements he made during his second interview with police were inadmissible because he did not, in fact, reinitiate contact with the officers. Rather, defendant argues that the trial court should have excluded evidence of his statements at trial because the police officers did not explicitly advise him a second time of his *Miranda* rights before resuming the interrogation." *Id.* at 417. The court went on to find that police were not required to advise Clark of his *Miranda* rights a second time. *Id.* at 417-21.

Clark appealed to the Michigan Supreme Court, but his application for leave to appeal was denied by standard form order. *People v. Clark*, 948 N.W.2d 577 (Mich. 2020) (Table).

Clark later filed the instant petition, raising the claims he presented to the state courts on direct appeal. (ECF No. 1.) He then successfully moved to stay the case so that he could exhaust additional claim in a state post-conviction review proceeding. (ECF Nos. 12, 14, 15.)

Clark moved to reopen the case. (ECF No. 18.) Significantly, Clark indicated that he was abandoning all his claims except for his suppression claim:

> While Petitioner is grateful for the Court's indulgence in this matter, he now realizes that a stay of proceedings is not prudent and that instead he should be myopically focused on the singular claim urged in the proposed amended petition; a claim that is premised root-and-branch on clearly established federal law as determined by the Supreme Court. 28 U.S.C. 2254(d)(1), and which the state courts have had a fair "opportunity to address th[is] claim[] in the first instance. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

(*Id.* PageID.1434.)

Clark's amended petition presents his sole claim as follows:

> The Michigan Court of Appeals' adjudication that Petitioner reinitiated contact with police following invocation of his right to counsel was contrary to and involved an unreasonable application of United States Supreme Court precedent.

(ECF No. 16, PageId.1418, ECF No. 17, PageID.1421.)

Clark asserts that after he invoked his right to counsel, he did not reinitiate contact with police because he did not indicate a desire to reopen a generalized discussion about the investigation. (*Id.* PageID.1424.) He asserts instead that he only expressed a willingness to sign any statement that Hoath made, and that it was police who

reinitiated the conversation by telling him that "it did not work that way" and that they would need his version of events. (*Id.* PageID.1425-27.) He asserts that the court of appeals therefore unreasonably found that he reinitiated contact with police, and therefore it erred in finding that his Fifth Amendment right counsel was not violated. (*Id.*)

## II. Standard of Review

Review of a § 2254 habeas petition is governed by the heightened standard set forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. To obtain relief, habeas petitioners who raise claims adjudicated on the merits by state courts must "show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential

standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted). Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. Discussion

Clark's sole claim is that his Fifth Amendment right to counsel was violated when he was subjected to a second interrogation. He asserts that his statement to an officer that he was willing to sign Hoath's statement did not constitute a reinitiation of contact with police because he did not say that he was also willing to discuss the case with them.

The claim involves clearly established Supreme Court law drawn from the *Miranda* line of cases. *Miranda* provides that law enforcement officers must inform a suspect regarding the right to remain silent and to an attorney during a custodial interrogation. *Id*. at 473-74. If the suspect indicates at any time that he wishes to remain silent or invokes his right to counsel, the interrogation must cease. *Id.*

A suspect may change his mind, however, and the police may speak with him if he is the one who reinitiates the discussion. When "an accused ... [expresses] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities ... unless [he] himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

An initiation of further communication can be shown where the suspect indicates "a willingness and a desire for a generalized discussion about the investigation" as opposed to merely making an inquiry "arising out of the incidents of the custodial relationship." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality). In *Bradshaw*, the Court found that a suspect initiated communication with

police that allowed further questioning when he asked an officer "Well, what is going to happen to me now?" The Court found that the suspect's question "could reasonably have been interpreted by the officer as relating generally to the investigation." *Id.* at 1046. In *Wyrick v. Fields*, 459 U.S. 42, 46 (1982), the Court described initiation as occurring when the suspect engages in a "further dialogue with the authorities," such as making a request to take a polygraph examination.

In deciding what law is clearly established under AEDPA, federal courts must not frame Supreme Court holdings at "a high level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013). Instead, habeas courts "must reasonably apply the rules 'squarely established' by [the Supreme] Court's holdings to the facts of each case." *White v. Woodall*, 572 U.S. 415, 427 (2014) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). "A legal principle is 'clearly established' within the meaning of [§ 2254(d)(1)] only when it is embodied in a holding of [the Supreme Court]." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *see also Berghuis v. Smith*, 559 U.S. 314, 327-33 (2010).

The holdings of *Edwards*, *Bradshaw*, and *Wyrick* clearly establish that after a suspect invokes his right to counsel, the police may question

him only if he is the one who reinitiates communication. But no Supreme case clearly establishes the minimum requirements for reinitiation of communication. Indeed, the Supreme Court explicitly declined to "build a superstructure of legal refinements around the word 'initiate.'" *Bradshaw*, 462 U.S. at 1045.

In *Edwards* there was no reinitiation by the suspect at all. The police came to the suspect's cell and initiated a second round of questioning the day after he invoked his right to counsel. *Edwards* provides no guidance on what constitutes reinitiation.

In *Bradshaw*, a plurality decision, the Court found that a suspect's question to police "What's going to happen to me now" constituted reinitiation because the question could reasonably be interpreted by the police as a request to enter into "a more generalized discussion relating directly or indirectly to the investigation." *Id.* 462 U.S. at 1045. But nowhere in *Bradshaw* did the Court hold that a request to enter into a generalized discussion relating to the investigation was a threshold requirement for a statement to count as a reinitiation. Rather, the Court was distinguishing the suspect's open-ended question from questions that are "routine incidents of the custodial relationship," such

as asking to use the bathroom or asking to use a phone. *Id.* Finally, in *Wyrick*, the Court found that when the suspect requested a polygraph examination, he "did not merely initiate a 'meeting.' By requesting a polygraph examination, he initiated interrogation." *Id.* at 47.

Clark argues that by stating only that he was willing to sign any statement that Hoath made, he was not reinitiating communication because it was a specific and limited request to sign a document and not a request to renew a general conversation about the case.

But the only types of statements that are definitively ruled-out by clearly established Supreme Court law as constituting reinitiations are questions or statements that are "routine incidents of the custodial relationship" *Bradshaw*, 462 U.S. at 1045. Examples given by the Supreme Court include "a request for a drink of water or a request to use a telephone." *Id.* What Clark said here was certainly more than a routine incident of the custodial relationship.

By telling the corrections deputy to inform the interrogating officers that what Hoath said was true and he was willing to "sign whatever" or "sign whatever is needed," officers could reasonably believe that Clark wanted to talk more about the case and likely

confess. Clark was told by police five minutes earlier that Hoath placed all the blame on him and had "sold him down the river."

Clark's statement to the corrections deputy thus effectively communicated to officers that he intended to take blame for the crime. Saying that he was willing to "sign whatever" to confirm Hoath's account certainly could reasonably be viewed as the reinitiation of discussions with police about what happened.

Clark urges a more myopic, literal interpretation – that Clark expressed a willingness to sign a document but not to talk with police. But the officers immediately dispelled any such ambiguity by asking before questioning him a second time if he was expressing a willingness to talk again after invoking his right to counsel just five minutes previously. Clark said he was.

Finally, citing *Michigan v. Mosely,* 423 U.S. 96 (1975), Clark argues that by stating only that he was willing to sign Hoath's statement, even if he reinitiated contact, he was exercising his right to control the scope of the interview which he was limiting to signing Hoath's statement. This argument can be rejected on the same basis. According to Miller, the officer who actually heard Clark's reinitiating

statement, Clark said that he was willing to "sign whatever" or "sign whatever is needed." Knowing that Hoath placed all the blame on him, Clark's statement that he was willing to "sign whatever" is not a statement attempting to limit the scope of a second interview. It was Clark telling police that he had reconsidered the matter and was now willing to fall on his sword and confess to the crime and protect Hoath.

Accordingly, when the Michigan Court of Appeals accepted Clark's concession in his appellate brief that he reinitiated communication with police, it did not accept a proposition that was contrary to, or involve an unreasonable application of, clearly established Supreme Court law. Clark therefore fails to demonstrate entitlement to habeas relief.

## IV. Certificate of Appealability

Before Clark may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Clark must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of Clark's claim. The Court will therefore deny a certificate of appealability.

V. Order

**THEREFORE, IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**SO ORDERED.**

Date: September 17, 2026

s/F. Kay Behm
F. Kay Behm
United States District Judge